Submitted on briefs January 31; reversed February 27, 1945

## PHILLIPS *v.* PHILLIPS

(156 P. (2d) 199)

Before BELT, Chief Justice, ROSSMAN, KELLY, BAILEY, LUSK, BRAND and HAY, Associate Justices.

*W. C. Winslow,* of Salem, for appellant.

*Rhoten & Rhoten* and *Sam F. Speerstra,* all of Salem, for respondent.

Suit for divorce by the plaintiff, Louisa M. Phillips, against Allan Q. Phillips. From a decree dismissing the suit, plaintiff appeals.

BRAND, J.

The complaint is in the usual form as to the matters of the marriage of the parties, the residence of the plaintiff, her previous good conduct, and as to the alleged cruel and inhuman treatment accorded her by the defendant. The specific allegations of cruelty are as follows:

"The defendant herein is quarrelsome both with plaintiff and the children of said defendant, and when quarrelsome curses and swears at both the children and this plaintiff. That defendant is mean to the children. That defendant has threatened to knock this plaintiff through the window, has threatened to kill plaintiff and threatened upon several occasions to hit her. That said defendant did, about four years ago, kick plaintiff, severely injuring her.

"That said conditions have become such that it is impossible for plaintiff and defendant longer to live together as husband and wife."

The complaint further alleges that the defendant is the owner of the real property which is described therein and which totals some two hundred sixty-eight acres in Marion County, Oregon.

Plaintiff alleges that the children referred to in the complaint are not the children of the plaintiff and the defendant, but are the children of the defendant only; that one of the children, Ethel Phillips, is of the age of fifteen years; that the defendant is mean and abusive to said child and that in the opinion of the plaintiff it would not be safe to leave said child with the defendant. The plaintiff, therefore, seeks custody of the minor child of the defendant together with temporary support for herself; permanent alimony; support for the minor child, Ethel Phillips; reasonable attorney's fees; and a one-third interest in the real property of the defendant.

The answer of the defendant was a general denial.

On the 13th day of September, 1943, the case went to trial upon the issues made by the complaint and answer. After the presentation of evidence, both parties rested and thereafter and on September 17, 1943, the defendant filed a motion for the reopening of the above suit for the purpose of taking additional testimony. No affidavit was filed in support of the motion, but in the motion itself it was represented to the court that the plaintiff had been previously married and had two minor children who were not then and for several years past had not been in her custody. It was stated that the evidence to that effect would be offered on the question of the plaintiff's demand for the custody of the defendant's children. No other grounds for reopening the case were set forth in the motion.

On September 28 the defendant moved the court for an order permitting the filing of an amended answer which was tendered with the motion. In support of this motion, defendant filed an affidavit containing the following allegation:

"That since the previous hearing in this suit, my son, Delmar Phillips, has told me that during the strawberry season of 1943 he observed the plaintiff and my son, Donald Phillips, commit an act of adultery in the cabin at my farm home.

"Previously, I did not know of the aforesaid testimony * * *." The amended answer repeats the accusation as above stated. The defendant does not seek a divorce for himself, but prays only for the dismissal of plaintiff's suit.

On October 18, by order of the court, the cause was reopened and on January 15, 1944, additional testimony

was taken upon the new matter set forth in the amended answer. The court made general findings in favor of the defendant and dismissed the plaintiff's suit, except as to $75 suit money which had been awarded to the plaintiff and had not been paid. The plaintiff received judgment for the sum of $75 and appeals from the decree dismissing her suit.

BRAND, J.

The first question for consideration is whether the plaintiff has sustained the burden of proof upon her allegations of cruel and inhuman treatment or personal indignities rendering life burdensome.

The defendant is the father of six children by a former marriage. His wife died in 1933 and in November, 1938, he married the plaintiff. The names and ages of his children at the time of trial, were as follows: Delmer, fourteen; Ethel and Elbert (twins) fifteen; Don, sixteen; Wayne, eighteen; and Claude, twenty. At that time Wayne and Claude were in the air corps. Delmer, the youngest, was staying with his father. Ethel, Elbert, and Don had voluntarily left their father's home and were living with plaintiff, their stepmother. The plaintiff was twenty-six and the defendant fifty-three years of age.

The defendant was the owner of two hundred eighty-eight acres of land, only two hundred sixty-eight acres thereof being described in the complaint. The land is all clear of debt, the final mortgage having been paid off in July, 1943. Of the 100-acre home place, twenty to twenty-five acres are under cultivation. Of the 128-acre place, forty to fifty acres are under cultivation. The rest is apparently uncultivated. The defendant rents other lands in addition to those owned

by him. He raises strawberries and grain and has some cows, hogs, and chickens. He has taken off about one million feet of timber and still has some "nice timber" left. Undisputed evidence indicates that the defendant has received very substantial sums of money for his strawberry crops and that shortly before the parties separated, he stated that he had $5,000 in the bank derived therefrom.

For five years, as a widower, the defendant had a long and hard struggle to maintain his family and develop his property. The home consisted of an old three-room house without electricity or any modern conveniences. Water for all domestic use was obtained from the creek and was carried to the house by bucket. The plaintiff undoubtedly knew of these conditions when she married the defendant, but the fact remains that as the financial condition of the defendant improved, we find no evidence of any attempt or willingness by him to ameliorate the primitive hardships of the earlier period. We think the evidence as a whole demonstrates that the defendant was a hard man to live with—profane, suspicious, and ill-tempered. We shall review, briefly, portions of the evidence.

Near the family home there is a bunk house in which some of the boys slept. The plaintiff testified that shortly after plaintiff and defendant were married, Claude, the oldest son of the defendant, was sick with a slight fever and had gone to bed in the bunk house. She went out to see him. The defendant followed her out and, finding her in the bunk house, became angry and told her to get out. She protested and as they started back to the house, the defendant swore and kicked her. The defendant, when questioned concerning the incident, answered, "I batted her with

my knee, yes.'' He testified that Claude was in bed and had his arms around plaintiff's neck and that he told the plaintiff that if she was going to act that way, ''she was done.'' Claude was fifteen years of age at that time. Plaintiff testified that she was merely sitting on the edge of her stepson's bed and he did not have his arms around her. She denied any improper conduct.

She testified further that on one occasion the defendant said to her, ''I have a notion to beat you to death,'' and that he often swore at her, sometimes employing what are known as fighting words, apparently without the proverbial accompanying smile. The fact of his profanity is verified by the testimony of some of the children and by his own admission.

On another occasion, a dispute arose as to whether the defendant's daughter should be allowed to go to Salem with the plaintiff. Both parties became angry. The plaintiff testified that, ''He [the defendant] was going to hit me and knock me through the car window.'' This incident is verified by the testimony of Don and Elbert. Concerning the same incident, the defendant testified that they had quarreled and said, ''I told her I would slap her face through the window if she didn't shut up.''

It appears further that there was general lack of discipline and peace in the home and that there were ''a lot of quarrels out there.'' On one occasion Wayne and Don started to fight over some matter not disclosed by the evidence. The defendant testified that he told Wayne to leave Don alone. Wayne said, ''You are not man enough to make me.'' The defendant testified, ''I took him down and choked it out of him, that is what I done * * *.'' The fight ended when the plaintiff,

Don, and Claude forcibly separated the defendant and Wayne, whereupon the defendant "started in cursing the three of them and told Louise [the plaintiff] she could leave, he didn't need her." Other disputes related to the driving of the pick-up truck, the operation of the woodsaw, the desire of the daughter to go to Salem to shows, the defendant's apparent suspicion that plaintiff was taking his daughter to see soldiers, the use of lipstick by Ethel, and the fact that Ethel giggled too much.

In answer to a question of the court as to alleged insinuations that the defendant was making about Ethel, the plaintiff testified:

"Well, he would talk about girls running around with soldiers all the time and about them getting bold and pretty bad, and then he would look at her and sneer and make out like she was doing the same thing."

Defendant's son Elbert testified that when plaintiff finally told the defendant she was leaving him on June 27, 1943, the defendant told her, "Now I've got the place paid for, I don't need you." This, however, was denied by the defendant.

The only matters with which we are directly concerned relate to the defendant's treatment of the plaintiff, but the general conditions under which plaintiff was required to live and for which we think the defendant largely responsible are relevant, even though they may bear more directly upon the relationship between the defendant and his children. Elbert testified that his father had mistreated him and that he no longer wished to live at the father's home. Ethel testified that her father had slapped her and hit her with his

fist and hurt her. She no longer wished to live with him. Don testified:

"Well, I don't know, I know I don't want to go back, I knew we never got along, none of the kids got along, there were fights all the time."

The defendant acknowledged that the children did not want to stay with him. When, after their final quarrel, the plaintiff left the defendant's home, Ethel went with her and a few days later Don and Elbert also left the defendant's home and went to stay with the plaintiff. The defendant himself testified concerning quarrels with his two sons concerning a woodsaw, the driving of a truck, and other matters which culminated when Elbert intimated to him that he was a Hitler. The defendant testified:

"A. * * * I slapped Elbert's face and Don jumped up and said 'He don't have to take that off you'. I said 'What have you got to do with this?' And he hit me and I closed down on him—that is true, isn't it?

"Q. This was the reason the boys left home?

"A. I suppose. * * *"

Defendant testified to various petty circumstances which raised his suspicions of undue intimacy between the plaintiff and the defendant's son Don. He particularly complained concerning a fishing trip in which a number of the family participated, but we find no evidence of any misconduct on her part at that time.

Without putting too much emphasis upon any single event in the lives of the parties, we think it clear that, owing perhaps to his earlier struggles and privations, the defendant had developed a hard and jealous disposition. The great disparity in age between plaintiff and defendant and the fact that the plaintiff and the

defendant's sons were very nearly of the same age, undoubtedly accentuated their differences and increased his jealousy. That the plaintiff and the children lived in an atmosphere of frequent, if not constant, bickering, fighting, and turmoil is apparent and we think the fault was chiefly that of the defendant. We think he did tell her that he had no further need of her since the place was paid for. The defendant contests the plaintiff's suit, but apparently does not expect nor desire that they resume marital relations. He testified as follows:

"Q. * * * do you think you and Mrs. Phillips could live together again?

"A. I don't think so, if she isn't satisfied, I don't want her there. I will say this much about the woman, as far as sociability, she was very agreeable, but Louise can't help some peculiarities of her disposition, that is against her."

█ Under these circumstances, we are led to the inference that the defendant's chief concern in defending the case was to protect his property rather than to preserve the marriage status. We think the plaintiff has established her charge of cruel and inhuman treatment and personal indignities rendering her life burdensome.

The remaining question relates to the belated charge of adultery preferred against the plaintiff in the amended answer. The only testimony concerning the specific act charged comes from Delmer, the defendant's fifteen-year old son, and the only one of the children who has not left home. It will be recalled that the cause was tried on September 13. Thereafter both parties rested and no suggestion was made concerning the alleged newly discovered evidence until September 28. The affidavit of the defendant filed on that date is to the effect that "since the previous

hearing'' his son Delmer communicated to him the evidence concerning plaintiff's alleged misconduct. The affidavit continues, ''Previously, I did not know of the aforesaid testimony.'' The affidavit leaves us in uncertainty as to the time referred to as ''previously'' when the defendant did not know of Delmer's testimony. We are not at all convinced that Delmer's story was, in fact, unknown to the defendant at the time of the principal hearing on September 13. After Delmer had testified to the alleged misconduct, defendant's counsel on direct examination asked him:

''Q. * * * Did you tell your father about that since the previous hearing?

''A. Yes, and before, too. No, it was afterwards.''

On cross-examination he stated that he had informed his father of the incident one night after the trial and explained his original testimony merely by saying, ''I couldn't remember.'' Still later he testified that the only time he talked with Mr. Rhoten, defendant's attorney, about the matter was on the steps of the courthouse and that it was since the first hearing. Delmer's testimony continues:

''Q. What were you doing out here on the steps with Mr. Rhoten since the other hearing?

''A. It was either after or before some one of those—the middle one of the hearings.

''Q. What do you mean by the middle one of the hearings?

''A. This is the third time we have been here.

''Q. The first time you were just down on the question of the allowance of suit money, wasn't it?

''A. I think so.

''Q. Was it at that time?

''A. I don't remember. It was one of the two. I think it was the middle one.

"Q. That is the time the case was tried?

"A. Yes.

"Q. And you stood out here on the steps at that time and told Mr. Rhoten about these things?

"A. Yes, I did."

The substance of Delmer's testimony concerning the specific act charged in the amended answer was to the effect that he had seen the plaintiff and the brother Don going out toward one of the berry picker's cabins about a hundred yards from the house, had sneaked out after them and that from a distance of about twenty feet, through the open door of the cabin, he had seen the plaintiff and his brother in a compromising position upon the bed and that they were kissing each other. He also testified to other alleged acts of undue familiarity at a time when the plaintiff, Delmer, Elbert, Don, and Ethel were living in a two-room apartment in Stayton in the winter of 1943. Here, too, the testimony is conflicting and there is no proof of actual immorality. The situation was a peculiar one. What may be the proper limit of intimacy between a stepmother and her stepson is a matter of ethics on which we are not disposed to be dogmatic.

Delmer's testimony concerning the cabin incident, if believed, would be sufficient to raise a reasonable inference that the plaintiff was guilty of the act charged, although it falls short, even at face value, of proving that the act was, in fact, committed. It is unsupported in any substantial particular. Concerning the alleged act, he testified that he did not know when it occurred, though he thought it was in June. In any event it was some time during the strawberry season. It was in a cabin about a hundred yards from the house, the door was open. Witness did not know whether other camp-

ers were living in any of the other cabins in the immediate vicinity. Witness saw nothing concerning the condition of their clothing. Immediately after looking through the door he started away and he got about ten feet away from the approach to the cabin when Don came out of the door. The hour could have been four-thirty or five in the afternoon. Delmer's credibility is impaired by his own testimony concerning his motive. He testified that he never said anything to Don about what he had seen and that Don never said anything to him about it, but he added:

"A. * * * I know I was always trying to get something on him to make him leave me alone, so as to have something against him.

* * *

"Q. Got something on him and never used it?

"A. No, I never used that straight forward, no, but I used it about telling what he had been doing if he didn't leave me alone.

"Q. You never talked to Don about this since that time?

"A. No."

The testimony of Delmer concerning the alleged act charged in the amended answer and concerning alleged familiarities in the apartment at Stayton is categorically denied by the plaintiff and by Don. The amended answer accuses the plaintiff of a crime. In the case of *Hawley v. Hawley,* this court quoted with approval from an opinion of Circuit Judge Bagley as follows:

" 'Every person accused of a crime is presumed to be innocent until the contrary is shown. This presumption applies in this case. We have, therefore, the testimony of the plaintiff that the defendant attempted to commit a crime (against morality) and the emphatic, positive denial of the defendant.

According to plaintiff and defendant equal credit for truth, there is no preponderance in favor of the plaintiff upon the charge named. The defendant's testimony is, however, aided by the presumption suggested, which balances the scale in favor of the defendant.' " *Hawley v. Hawley,* 101 Or. 649, 654, 199 P. 589.

■ This court is not gifted with omniscience. It can not arrive at complete certainty or certitude as to the truth of charges such as these. It can only apply the rules of law to the evidence and determine the issue according to those rules. The burden of proof was upon the defendant to establish the misconduct charged in his amended answer and we think that he has failed to sustain it. In resolving this issue we do not have the benefit of the opinion of the trial judge for there are no specific findings of fact upon it. The decree merely recites that the court "finds in favor of the defendant * * *." Whether the trial court was of the opinion that the plaintiff had failed to establish the case set forth in the complaint, or that the defendant had established the defense contained in the amended answer, or that the parties were *in pari delicto,* we can not know.

■ There may be some reluctance in a case of this kind in awarding to the plaintiff an undivided interest in the real property of the defendant, but such reluctance must in no way influence judicial decision. Our duty is to determine the merits of the case, and that being done, we have no discretion concerning the division of the real property. The statute requires:

"Whenever a marriage shall be declared void or dissolved, the party at whose prayer such decree shall be made shall in all cases be entitled to the undivided third part in his or her individual right

in fee of the whole of the real estate owned by the other at the time of such decree * * *." Ch. 407, Or. L. 1941.

We are bound by this statute.

■ In her complaint the plaintiff asks for the care and custody of the defendant's daughter, Ethel Phillips, and in her testimony she asks for the custody of Elbert and Don as well. Don, however, is now in the navy. The statute concerning decrees of divorce specifies that the court shall have power to provide for the future care and custody of the minor children of the marriage. The children in the case at bar are not "the children of the marriage" and the statute gives no power to the court to provide for their custody. Whatever may be the inherent power of equity when properly invoked to deprive a father of the legal custody of his children (46 C. J., Parent and Child, § 25, p. 1249), we think neither the pleadings nor the proof require that we explore that field in the case at bar.

The decree of the circuit court is reversed. The plaintiff is awarded a decree of divorce against the defendant, together with an undivided third part in her individual right in fee of the whole of the real estate owned by the defendant at the time of the decree and described in the plaintiff's complaint. The prayer of the plaintiff for the custody of Ethel Phillips; for support *pendente lite*; for permanent alimony; for temporary and permanent support of Ethel Phillips; and for suit money and attorney's fees, is denied. Plaintiff may have her costs and disbursements herein.